# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

**WILLIAM ROLANDUS KEEL,**      )
**#559437,**      )
     )
         **Petitioner,**      )
     )      **No. 3:23-cv-01147**
**v.**      )
     )
**CHANCE LEEDS,**      )
     )
         **Respondent.**      )

## <u>MEMORANDUM OPINION</u>

Before the Court is a pro se petition for writ of habeas corpus filed under 28 U.S.C. §

2254. (Doc. No. 1). Petitioner William Rolandus Keel is a state prisoner incarcerated at the

Whiteville Correctional Facility. Keel challenges his Davidson County Criminal Court jury trial

conviction for two counts of rape of a minor. Keel was sentenced to consecutive 30-year terms.

<u>See State v. Keel</u>, No. M2016-00354-CCA-R3-CD, 2017 Tenn. Crim. App. LEXIS 14, *6-7, 2017

WL 111312 (Tenn. Crim. App. January 11, 2017). Respondent filed an answer to the petition,

asking the Court to dismiss the case with prejudice. (Doc. 17).

Also pending before the Court are a series of motions filed by Petitioner. The motions

largely seek orders to aid Keel's ability to litigate his petition and to enlarge the record. (Docs. 20,

21, 22, 23, 24 25, 26, 28, 30, 33, and 41).

Despite the pending motions, the petition is ripe for review, and this Court has jurisdiction

pursuant to 28 U.S.C. § 2241(d). Having fully considered the pleadings and the record, the Court

finds that further development of the record is not needed, and Petitioner is not entitled to relief.

<u>See Christian v. Hoffner</u>, No. 17-2105, 2018 U.S. App. LEXIS 39336, 2018 WL 4489140, at *2

(6th Cir. May 8, 2018) ("A district court is not required to hold an evidentiary hearing if the record 'precludes habeas relief.'") (quoting <u>Schriro v. Landrigan</u>, 550 U.S. 465, 474 (2007))). The petition therefore will be denied, and this action will be dismissed.

## I. PROCEDURAL HISTORY

Petitioner was charged by the Davidson County Grand Jury with two counts of rape of a child in connection with allegations that he sexually assaulted his minor stepdaughter. Petitioner's first trial ended in a mistrial after the jury was unable to return a verdict. Petitioner represented himself at a second trial with his prior counsel serving as elbow counsel. After the second trial, the jury found Petitioner guilty of both counts, and the court subsequently sentenced him to consecutive terms of 30 years in the Department of Correction.

Petitioner, through appointed counsel, filed a motion for new trial, but it was denied by the trial court. Petitioner's convictions were thereafter affirmed by the TCCA on direct appeal, and the Tennessee Supreme Court denied leave to appeal. <u>Keel</u>, <u>supra</u>, perm. app. denied (Tenn. Apr. 13, 2017) (Doc. 14-19).

Petitioner filed a petition for post-conviction relief that was denied after an evidentiary hearing. (Doc. 14-26, PageID.4467-76). Petitioner appealed, asserting that he had been denied a full and fair hearing. The TCCA remanded the case to allow Petitioner to testify in support of his ineffective assistance of counsel claims. <u>Keel v. State</u>, No. M2019-00612-CCA-R3-PC, 2020 WL 5407489, at *1 (Tenn. Crim. App. Sept. 9, 2020) (Doc. 14-35).

The post-conviction court conducted the remand hearing, after which it again denied relief. (Doc. 15-1, PageID.4813). Petitioner again appealed, the TCCA affirmed, and the Tennessee Supreme Court denied leave to appeal. <u>Keel v. State</u>, No. M2022-00089-CCA-R3-PC, 2022 WL

2

17098474, at *1 (Tenn. Crim. App. June 7, 2023) (Doc. 15-10), perm. app. denied (Tenn. Oct. 13, 2023).[1]

On October 30, 2023, Petitioner filed the present 184-page pro se habeas petition, complete with 2382 pages of exhibits. (Doc. 1) Petitioner subsequently moved to supplement his petition was a 205-page document relating to his pending corum nobis proceeding. (Doc. 11). The motion was denied. (Doc. 31).

Respondent filed copies of the state court record and an answer to the petition. (Docs. 14, 15, and 17). Petitioner thereafter filed a raft of motions seeking to: have his pro se pleadings construed liberally (Doc. 20), have Respondent file a complete and unredacted copy of the state record, (Docs. 21, 22, 26), stay proceedings until Petitioner has access to a complete and unredacted record, (Doc. 23), appoint counsel to represent petitioner, (Doc. 24), allow Petitioner to have unrestricted access to the prison law library and a computer that can play the CD/DVD filed by Respondent, (Docs. 25, 30, 33), and seeking oral argument via video. (Doc. 41). Petitioner has not filed a reply to Respondent's answer to the habeas petition.


## II. STATEMENTS OF FACTS

The TCCA summarized the state trial court proceedings:

> The State's proof at trial showed that the victim, V.S., was born in June 2000 and lived with her grandparents and her younger siblings in Nashville. At some point in 2011 or early 2012 when the victim was either 10 or 11 years old, the victim and the defendant, who was her then-stepfather, were playing the board game Monopoly in the defendant's bedroom; the bedroom was located on one side of the duplex owned by the victim's grandmother. During the course of the game, the defendant and the victim "came up with a bet" that if the victim won, she would "get ungrounded," and if the defendant won, he could "do whatever." After the defendant won the game, he instructed the victim to turn around. When he told her

---

[1] Petitioner filed a petition for corum nobis that was denied in the trial court and TCCA. (Doc. 39). The last information provided to the Court indicates that Petitioner is seeking rehearing on this petition in the TCCA. (Id. PageID.5749).

3

to turn back toward him, his genitals were exposed. The defendant forced the victim to sit on the ground, used his hands to forcibly open her mouth, and he placed his penis inside her mouth. The victim could not recall the length of time of the assault, and she did not see the defendant ejaculate. The defendant told the victim "not to tell anybody or it would happen again." Following the assault, the victim returned to her grandmother's side of the duplex. She testified that she told no one because she "was too scared . . . of what he said."

The victim testified that the second incident occurred at the residence of the defendant and the victim's mother when the victim was "[a]round 11" years of age. The defendant came to the victim's grandmother's house one morning to drive the victim to school, and while en route to school, the victim told the defendant that she needed to use the restroom. The defendant stopped at the house in Donelson. When the victim came out of the bathroom, the defendant was "standing right there." She attempted to shut the bathroom door, but the defendant pushed it open, causing the victim to fall to the floor. The defendant had again exposed his genitals and forced his penis into the victim's mouth. The victim denied that she saw the defendant ejaculate, and she testified that this assault did not last "too long" because she "had to get to school." The defendant then drove the victim to school, and the victim did not immediately tell anyone about the assault because she "was scared that he would do it again."

The victim eventually informed her grandmother, C.F., that the defendant had "made [her] put his private part in [her] mouth." C.F. then contacted law enforcement officers.

Denise Alexander, a forensic social worker with Our Kids Clinic, conducted a pediatric forensic medical examination of the victim on March 22, 2012. Ms. Alexander found the victim to be "outgoing and friendly" until Ms. Alexander mentioned the defendant's name, at which time the victim "became very quiet and stated [that] she didn't like him very much." At that point, the victim "refused to speak about [the defendant] any further." The victim denied that anyone had ever touched her inappropriately. Ms. Alexander explained that such denials are "not uncommon" during interviews with suspected child sexual abuse victims.

Lori Littrell, a physician assistant at Our Kids Clinic, performed the physical portion of the victim's forensic medical examination. Ms. Littrell found no "trauma or visible injury" to the victim, which she testified was not uncommon. Ms. Littrell testified that, because the time period from the victim's initial disclosure to C.F. until the victim's examination was greater than 72 hours, she knew "the likelihood of recovering any type of DNA" would be "pretty much non-existent."

Charlsi Legendre, senior forensic interviewer with the Nashville Children's Alliance, testified that her organization provides forensic interviews and counseling services for minor victims of sexual abuse and other victims of severe physical

abuse and neglect. Ms. Legendre explained that one of her former employees had conducted a forensic interview of the victim in May 2012. Through Ms. Legendre's testimony, the State introduced into evidence and played for the jury a video recording of the victim's forensic interview, during which the victim described the incidents of sexual abuse perpetrated by the defendant following the game of Monopoly and inside the bathroom at the defendant's house.

With this evidence, the State rested. Following the trial court's denial of the defendant's motion for judgments of acquittal and a Momon colloquy, the defendant elected not to testify but did choose to present other proof.

Kenneth Hardy testified that he had been previously employed as a case manager with the Department of Children's Services ("DCS"). Mr. Hardy stated that, on June 29, 2011, he conducted a home visit at the residence of C.F. and spoke with the victim. Mr. Hardy explained that "[s]omeone reported to [DCS] something concerning these children" and that he was the case manager assigned to conduct "a physical view of the children in their home." When Mr. Hardy interviewed the victim, she told him that she was not afraid of the defendant; that she had received "a whooping with a paddle" approximately two years prior but that she had never been injured; and that her mother was currently incarcerated. Mr. Hardy testified that the victim did not mention anything about sexual abuse during the interview.

Rashondalyn Nixon testified that she had been a case manager with DCS in 2012 and that she had been present on the night that the victim accused the defendant of sexual abuse. Ms. Nixon reviewed her notes from her interview with the victim and testified that, with respect to the Monopoly incident, the victim stated that she had lost the game and the defendant "made her look at his body part."

Based on this evidence, the jury convicted the defendant as charged of both counts of rape of a child. Following a sentencing hearing, the trial court sentenced the defendant as a standard offender to a term of 30 years' incarceration for each conviction, to be served at 100 percent by operation of law. The court ordered the sentences to be served consecutively for a total effective sentence of 60 years. Following the denial of his timely motion for new trial, the defendant filed a timely notice of appeal.

State v. Keel, No. M2016-00354-CCA-R3-CD, 2017 Tenn. Crim. App. LEXIS 14, *2-7,

2017 WL 111312 (Tenn. Crim. App. January 11, 2017) (footnote omitted).

Following Petitioner's direct appeal, protracted post-conviction proceedings were held in

the state courts. Petitioner's first petition for post-conviction review resulted in three evidentiary

hearings, and a fourth evidentiary hearing was held after the case was remanded by the TCCA. In

its opinion denying Petitioner post-conviction relief, the TCCA summarized the evidence adduced at all four hearings:

> At the first evidentiary hearing, trial counsel provided the following testimony:
>
>> [Trial c]ounsel testified that he was appointed to represent the Petitioner on the rape of a child charges and that he represented the Petitioner through the first trial that resulted in a hung jury and mistrial. After the mistrial, the Petitioner asked the trial court to appoint Frank Mondelli, and [trial c]ounsel transferred the Petitioner's file to Mr. Mondelli, who was also representing the Petitioner on a civil matter. At some point, Mr. Mondelli's representation of the Petitioner on the rape charges ended, and the trial court requested [trial c]ounsel serve as "elbow counsel" for the Petitioner's second trial due to his familiarity with the case. [Trial c]ounsel agreed, and the Petitioner represented himself during the second trial and was convicted. Following the second trial, the Petitioner asked [trial c]ounsel to represent him on the motion for new trial and appeal, and [trial c]ounsel agreed.
>>
>> About serving as "elbow counsel" during the second trial, [trial c]ounsel said that he largely viewed his role as a resource for the Petitioner should the Petitioner need assistance. He recalled an issue that arose during the second trial related to introduction of a recorded police interview with the Petitioner. Based upon [trial c]ounsel's involvement with the first trial, he was aware that portions of the interview were ruled inadmissible and that the State had created a redacted copy for trial; however, during the second trial, when the State played the recording, [trial c]ounsel realized that it was the unredacted recording and intervened. The trial court gave the jury a curative instruction, and the State played the redacted version of the interview. He explained that he believed that it was an oversight where the State "simply pulled the wrong CD." Other than this involvement, [trial c]ounsel "had no interaction in the second trial."
>>
>> [Trial c]ounsel testified that, following the conviction in the second trial, he began representing the Petitioner at the Petitioner's request. He consulted with the Petitioner about various appellate issues prior to filing the appeal. [Trial c]ounsel stated that the Petitioner "correspond[ed] with [him] regularly," but [trial c]ounsel did not specifically recall a request for "an amended appeal." He recalled the Petitioner identifying the introduction of the unredacted recording as possible prosecutorial misconduct, but [trial c]ounsel

6

did not raise it on appeal. He explained that he was uncomfortable asserting prosecutorial misconduct based upon an inadvertent mistake. Furthermore, he believed any error was cured by the trial court's instruction to disregard the incorrect recording.

[Trial c]ounsel testified that he did not recall the Petitioner asking him to raise, in either the motion for new trial or the appeal, the trial court's denial of the Petitioner's request for transcripts from the first trial. Neither did he recall any discussion at the second trial during which the [Petitioner] was denied transcripts from the first trial. Nonetheless, [trial c]ounsel did not believe the denial of trial transcripts would have been an appealable issue because the Petitioner "was provided with the entirety of the transcripts."

[Trial c]ounsel recalled a recording of a phone call ("Phone Call Recording") that the Petitioner and his wife placed to the victim. During the conversation, the Petitioner and his wife asked the victim "why would you say this about . . . [the Petitioner?]" [Trial c]ounsel reviewed the Phone Call Recording "a lot" and, after determining that this recording was not favorable to the Petitioner, he chose not to introduce it during the first trial. [Trial c]ounsel did not recall the Petitioner attempting to introduce the Phone Call Recording during the second trial but noted that he was unaware of what motions had been filed with regard to the recording before he served as "elbow counsel." He did not recall raising any issue about the Phone Call Recording in the motion for new trial or the appeal. Further, he acknowledged that he did not raise sufficiency of the evidence on appeal but rather chose to focus on sentencing.

[Trial c]ounsel testified that the trial court admitted into evidence a video recording of the victim's interview at the second trial, but he did not recall whether the Petitioner objected to the introduction of the video interview or whether [trial c]ounsel raised it in the motion for new trial and on appeal. [Trial c]ounsel did, however, challenge the trial court's exclusion of expert testimony from Dr. William Bernet.

On cross-examination, [Trial c]ounsel testified that he had been practicing law for thirteen years and, since 2010, a large portion of his practice was criminal law. [Trial c]ounsel estimated that he spent approximately 800 hours working on the Petitioner's case and considered himself "well versed in every aspect." [Trial c]ounsel stated that after sitting through the second trial, based on his experience, he raised every issue he believed was "ripe" for the motion for new trial and appeal.

7

Id. at *2-3.

During the second and third evidentiary hearings, the post-conviction court addressed several motions filed by the Petitioner and heard testimony of two additional witnesses with respect to the post-conviction petition. The relevant portion of our summary of what transpired at the second evidentiary hearing is below:

Motion to Obtain a Recording of the July 25, 2015, Hearing

The Petitioner next was asked about his "motion to obtain the audio with video of the July 25th hearing." The Petitioner explained that, during the July 25, 2015 hearing, the trial court told [trial c]ounsel to provide the State with a copy of the Phone Call Recording, the content of which the Petitioner interpreted as the victim recanting. Despite this instruction, [trial c]ounsel failed to do so, preventing the Petitioner from presenting the Phone Call Recording during the second trial. The Petitioner explained that he wanted the recording of the July 25, 2015 hearing to show that the trial court had told [trial c]ounsel to provide the State with the Phone Call Recording to support his claim that [trial c]ounsel was ineffective for failing to do so. The post-conviction court denied the Petitioner's request for a recording of the hearing but suggested that he request a copy of the hearing transcript.

The State then questioned the Petitioner, who agreed that [trial c]ounsel was questioned about the Phone Call Recording during the previous, September 14, 2018 hearing. He further agreed that [trial c]ounsel had testified that he had reviewed the recording and did not seek to introduce the Phone Call Recording because the content was not beneficial to the Petitioner. The State then offered to provide the second trial transcript for further discussion of this motion at the next hearing. The post-conviction court retracted the earlier ruling denying this motion and stated that it would take this motion under advisement.

Id. at *4-5.

The relevant portions of our summary of what transpired at the third evidentiary hearing are below:

The post-conviction court then returned to the Petitioner's motion requesting a recording of the July 25, 2015 hearing. The post-conviction court stated that it had reviewed the transcript of the second trial. The post-conviction court found that the trial court had initially denied the Petitioner's request to introduce the Phone Call

8

Recording at trial because the State had not received a copy but that the parties had litigated the issue nonetheless. The transcript indicated that the State and the trial court had reviewed the Phone Call Recording after court adjourned. The following day, the trial court found that the victim's statement during the recorded telephone conversation was not inconsistent but consistent with her trial testimony and therefore could not be admitted under the Rules of Evidence. Based upon the review of the transcript of the second trial, the post-conviction court denied the Petitioner's "motion to obtain the audio with video of the July 25th hearing."

After the post-conviction court addressed the matters it had previously taken under advisement, the Petitioner presented further testimony in support of his post-conviction petition. Charles Hale testified that he was the Petitioner's case manager at the Whiteville Correctional Facility from June 2017 until "about September." Mr. Hale stated that he placed telephone calls to [trial c]ounsel at the Petitioner's request on August 16, 2017, and August 24, 2017. On neither occasion was Mr. Hale able to speak with [trial c]ounsel, so Mr. Hale left a message instead. [Trial c]ounsel never returned the phone calls. Mr. Hale stated that he was unaware of any video conference calls arranged between [trial c]ounsel and the Petitioner or any in-person visits. On cross-examination, Mr. Hale agreed that he would not have been made aware of any written communication between [trial c]ounsel and the Petitioner.

Id. 2017 Tenn. Crim. App. LEXIS 14, at *6 (footnote omitted).

Testimony at Remand Post-Conviction Evidentiary Hearing

At the December 14, 2021 hearing held upon our remand of the case to the post-conviction court, the Petitioner testified that he wanted trial counsel to raise the trial court's exclusion of the Phone Call Recording as an issue in the motion for new trial and on appeal, but trial counsel did not. The Petitioner stated that he asked the victim during the second trial if her grandmother had told her that she would go to jail if she "told the police, told the Judge or the State or anybody anything different from what they talked about[,]" and the victim "said yes, on the record." He said he attempted to introduce the Phone Call Recording to "back it up[,]" but the trial court sustained the State's objection.

Post-conviction counsel then attempted to introduce a copy of the Phone Call Recording as an exhibit to the evidentiary hearing. The State objected, arguing that the "issue was litigated ad nauseum[,]" and that the substance of the phone call was irrelevant to whether trial counsel was ineffective for not raising the issue in the motion for new trial and on appeal. Post-conviction counsel responded that the substance of the recording was "pertinent to whether or not [trial counsel] should

9

have brought it up on the motion for new trial[,]" and cited <u>Goad v. State</u>, 938 S.W.2d 363 (Tenn. 1996), for the proposition that there are limits to the deference afforded to trial counsel's strategic decisions. The post-conviction court would not allow post-conviction counsel to play the recording in open court but marked it as an exhibit for identification purposes only, with the post-conviction court reserving its ruling on its admissibility pending further research into the law.

When the Petitioner's testimony resumed, he agreed that the State objected at trial to the introduction of the Phone Call Recording on the basis that it had not been disclosed in discovery. He testified that the trial court adjourned to take the matter under advisement. When court resumed the next day, the trial court allowed argument on the issue but ultimately excluded the Phone Call Recording because a copy had not been provided to the State in discovery and because it was not a prior inconsistent statement.

With respect to the trial court's exclusion of the evidence on the basis that the Petitioner had not provided it in discovery, the Petitioner testified that a former lawyer, who had passed away, gave the State notice of the existence of the Phone Call Recording in his response to discovery at the beginning of the proceedings before the first trial was held. As for the trial court's exclusion of the Phone Call Recording on the basis that it was not admissible as a prior inconsistent statement, the Petitioner expressed his opinion that the trial court misinterpreted the evidence and stated the reason he wanted it played for the jury:

> Q. Okay. What about the claim that it's a prior inconsistent statement, not a prior inconsistent statement?
>
> A. Well, um, it wouldn't be a prior inconsistent statement, because what she said on there was the truth. It wasn't an inconsistent statement. It was never mentioned before.
>
> Q. Right.
>
> A. And I was trying to use it to impeach her.

The Petitioner testified that in the Phone Call Recording, the victim said that her grandmother had told her that "if she told the truth that it didn't happen that she'd go to jail." He agreed that the statement was slightly different from what he initially asked the victim at trial. He further agreed that he inquired in a sidebar if he could ask the victim if she ever acknowledged to her mother "that the truth is that this did not happen[,]" and that the trial court allowed the question but told him that he was "stuck with whatever the answer is." He said the victim's response was, "I don't think I ever have." The Petitioner testified that the victim was lying and that he wanted to play the Phone Call Recording "[t]o impeach her and to show the motive." The Petitioner acknowledged that the victim's grandmother responded "no" when he asked her if she ever told the victim that she could go to jail if she

changed her story about what had happened. He stated that the Phone Call Recording would have also proved that the grandmother was lying.

When asked how the Phone Call Recording came about, the Petitioner explained that the victim called the victim's mother when the Petitioner and the victim's mother were together at the mile-long yard sale in Watertown and that the victim's mother put the call on speaker phone. According to the Petitioner, during that unrecorded phone conversation, the victim said, "Mommy, I told Meme the truth that [the Petitioner] didn't do that to me and Meme told me if I told the truth it didn't happen I'd go to jail. I'm scared, Mommy." The Petitioner testified that the victim's mother called the victim back the following day and recorded the conversation to confirm what the victim had told her in the previous day's unrecorded phone conversation.

The Petitioner testified that he attempted multiple times to contact trial counsel to discuss the issue, but he never heard from trial counsel after the guilty verdicts were returned. He said he wrote trial counsel "letters, upon letters, upon letters" and "even went to his case manager Charles Hale," who "verified [at the earlier evidentiary hearing] that [trial counsel] never contacted [the Petitioner] back when he tried to call him" and never came to see the Petitioner.

The Petitioner testified that the trial court granted his pretrial motion to prevent Detective Ferrell from saying anything that could be construed as his opinion on the truthfulness of the victim. As a result of that ruling, the Petitioner's recorded interview with Detective Ferrell was redacted to eliminate prejudicial portions, including where Detective Ferrell stated that he, the district attorney, and the DCS case manager could tell when a victim was lying and that the victim in this case was telling the truth. The Petitioner stated that during the trial, the State played the original version, and the jury "heard the whole unredacted CD." He said when he realized what was happening, he looked at trial counsel and saw him holding his phone underneath the table texting someone. Trial counsel put his phone down, and a second later, the prosecutor picked up his phone, looked over at trial counsel, and stopped the proceedings. The Petitioner testified that the parties approached the bench and that he and trial counsel "objected to it because some of the things were already said." The trial court responded by issuing a curative jury instruction, but the Petitioner believed it was insufficient because "you can't paint a pink polka dotted elephant in front of a jury and tell them to disregard it." He said trial counsel raised the issue in the motion for new trial but did not raise it on appeal. The Petitioner stated that he did not find trial counsel's rationale for not raising the issue on appeal to be sufficient because, regardless of whether the playing of the unredacted CD was accidental rather than intentional, the jury's having heard it prejudiced his case.

The Petitioner testified that he also wanted trial counsel to raise as an issue in the motion for new trial and on appeal the trial court's having allowed the State's expert witnesses, Lori Littrell and Denise Alexander, to testify about common

11

characteristics of sexually abused children. He said their testimony was the same type of testimony that he had sought to introduce through his excluded expert witness, Dr. William Bernet. He provided the following example of testimony that he believed to be objectionable:

> A.--and, uh, I believe the question was asked, um, to her didn't [the victim] say and deny that these things ever happened to her and instead of saying yes, and leaving the question at that she goes on to say something around the lines, I can't quote what she said exactly, but she, she portrayed it as though, but, uh, children lie.

The Petitioner said he did not object to the testimony at trial because he "didn't want to bring the issue of Dr. B[ernet]1 in front of the jury." However, he believed it was plain error and that trial counsel should have raised it in the motion for new trial and on appeal.

The Petitioner also thought that trial counsel should have raised in the motion for new trial and on appeal issues related to the sufficiency of the evidence and the trial court's failure to comply with the provisions of Tennessee Code Annotated section 24-7-123 in determining the admissibility of the forensic interview of the victim. He thought trial counsel should have raised an issue regarding the trial court's failure to comply with Tennessee Code Annotated section 24-7-123 because the forensic interviewer was not qualified and used improper coercive tactics and leading questions. He thought trial counsel should have raised an issue regarding the sufficiency of the evidence because the only proof at trial consisted of "he said, she said" evidence. Moreover, had he been permitted "to provide the evidence that [he] wanted to provide," the proof "would have clearly showed that [he] was actually innocent[.]"

On cross-examination, the Petitioner acknowledged it was the prosecutor who stopped the playing of his unredacted police interview, and that he did not object prior to the prosecutor's actions. He insisted that the entire CD was played before the prosecutor stopped the recording. He conceded the trial transcript appeared to show otherwise, reflecting that the prosecutor told the trial court that he thought they were "about to get into something [that they] were not supposed to." Nonetheless, the Petitioner was adamant that the jury heard the entire unredacted interview: "I don't care what the transcripts say. I know I was there. They played the entire tape." The Petitioner testified that he asked trial counsel to raise the issue on appeal, but trial counsel did not.

The Petitioner acknowledged that he failed to object to the State's expert witnesses and repeated that it was because he did not want to mention Dr. Bernet in front of the jury. He also cited the exclusion of Dr. Bernet's testimony as the reason he failed to file a motion in limine to exclude the victim's forensic interview,

12

asking, "And how am I going to argue it if the expert child psychologist wasn't allowed to be used?"

On January 14. 2022, the post-conviction court entered an order sustaining the State's objection to the introduction of the Phone Call Recording as an exhibit to the post-conviction proceedings. The post-conviction court found that trial counsel made an informed decision based on adequate preparation in his determination of which issues to raise on appeal, and, as such, that the content of the recording had "no bearing on the existence of any fact that is of consequence to the determination of [trial counsel's] effectiveness in his representation of [the Petitioner.]"

On January 19, 2022, the post-conviction court entered a lengthy written order denying the petition for post-conviction relief. Among other things, the court reviewed the merits of the omitted issues before finding that the Petitioner failed to show that trial counsel was deficient for not raising the issues.

Keel v. State, No. M2022-00089-CCA-R3-PC, 2023 Tenn. Crim. App. LEXIS 198, *8-25, 2023

WL 3862777 (Tenn. Crim. App. June 7, 2023) (Doc. 15-10).

## III. STANDARD OF REVIEW

Federal habeas review of a state conviction involves a myriad of procedural rules. First among them is the requirement that a habeas petitioner fairly present his federal claims to the state courts before he presents them in federal court. If the state court denies a federal claim on the merits, then the state-court adjudication is afforded a substantial degree of deference on federal habeas review. If, on the other hand, the state court denies relief because the petitioner failed to comply was a state procedural rule, then the claim is generally barred from habeas relief absent a showing of cause and prejudice. There is substantial interplay between these rules.

First, "[b]efore seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." Baldwin v. Reese, 541 U.S. 27, 29 (2004) (citations omitted). "To provide the State with the necessary 'opportunity,' the

prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." Id. (citation omitted); Gray v. Netherland, 518 U.S. 152, 162-63 (1996) (the substance of the claim must have been presented as a federal constitutional claim). Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. See Picard v. Connor, 404 U.S. 270, 275 (1971); see also Pillette v. Foltz, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review"). In Tennessee, a petitioner is "deemed to have exhausted all available state remedies for [a] claim" when it is presented to the TCCA. Adams v. Holland, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. Sup. Ct. R. 39).

Where a claim is presented to the state courts under the exhaustion requirement and rejected on the merits, 28 U.S.C. § 2254(d)(1) curtails a federal court's review of the claim. Relief is barred under this section unless the state court adjudication was "contrary to" or resulted in an "unreasonable application of" clearly established Supreme Court law. "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" Mitchell v. Esparza, 540 U.S. 12, 15-16 (2003), quoting Williams v. Taylor, 529 U.S. 362, 405-06 (2000). "[T]he 'unreasonable application' prong of the statute permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." Wiggins v. Smith, 539 U.S. 510, 520 (2003) quoting Williams, 529 U.S. at 413.

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011), quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 562 U.S. at 103 (internal quotation omitted).

When, on the other hand, the state court rejects a claim because a habeas petitioner failed to comply with a state procedural rule, the claim is considered to be procedurally defaulted. The procedural default rule applies when the state court actually "relied on the procedural bar as an independent basis for its disposition of the case." Caldwell v. Mississippi, 472 U.S. 320, 327 (1985). The same rule applies where a petitioner fails to properly exhaust a claim, and there is no longer a procedural mechanism available for him to present the unexhausted claim to the state courts. Woodford v. Ngo, 548 U.S. 81 (2006).

"In order to gain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate cause and prejudice for the failure, or that a miscarriage of justice will result from the lack of review." Alley v. Bell, 307 F.3d 380, 386 (6th Cir. 2002. The burden of showing cause and actual prejudice to excuse defaulted claims is on the habeas petitioner. Coleman v. Thompson, 501 U.S. 722, 750 (1991); Lucas v. O'Dea, 179 F.3d 412, 418 (6th Cir. 1999) (citing Coleman). A petitioner may establish cause by "show[ing] that some objective factor external to the defense

impeded counsel's efforts to comply with the State's procedural rule." Murray v. Carrier, 477 U.S. 478, 488 (1986). Objective impediments include an unavailable claim or interference by officials that made compliance impracticable. Id.

Constitutionally ineffective assistance of trial or appellate counsel may constitute cause. Murray, 477 U.S. at 488-89. Generally, however, if a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective assistance claim must itself have been presented to the state courts as an independent claim before it may be used to establish cause. Id. If the ineffective assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can be used as cause for the underlying defaulted claim only if the petitioner demonstrates cause and prejudice with respect to the ineffective assistance claim. Edwards v. Carpenter, 529 U.S. 446, 452-53 (2000).

Petitioners in Tennessee also can establish "cause" to excuse the procedural default of a substantial claim of ineffective assistance of trial counsel by demonstrating the ineffective assistance of post-conviction counsel in failing to raise the claim in initial review post-conviction proceedings. See Martinez v. Ryan, 566 U.S. 1, 5-6 (2012) (creating an exception to Coleman where state law prohibits ineffective assistance claims on direct appeal); Trevino v. Thaler, 569 U.S. 413, 429 (2013) (extending Martinez to states with procedural frameworks that make meaningful opportunity to raise ineffective assistance claim on direct appeal unlikely); Sutton v. Carpenter, 745 F.3d 787, 792 (6th Cir. 2014) (holding that Martinez and Trevino apply in Tennessee). The Supreme Court's creation in Martinez of a narrow exception to the procedural default bar stemmed from the recognition, "as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim." Martinez, 566 U.S.

16

at 13. In other words, <u>Martinez</u> requires that the ineffective assistance of post-conviction counsel occur during the "initial-review collateral proceeding," and that "the underlying ineffective-assistance-of-trial-counsel claim [be] a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." <u>See id</u>. at 13-15. Importantly, <u>Martinez</u> did not dispense with the "actual prejudice" prong of the standard for overcoming procedural default first articulated by the Supreme Court in <u>Coleman</u>.

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." <u>Perkins v. LeCureux</u>, 58 F.3d 214, 219 (6th Cir. 1995) (quoting <u>United States v. Frady</u>, 456 U.S. 152, 170 (1982) (emphasis in original)). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." <u>Simpson v. Jones</u>, 238 F.3d 399, 409 (6th Cir. 2000) (citations omitted).

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the Supreme Court also has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. <u>Dretke v. Haley</u>, 541 U.S. 386, 392 (2004) (citing <u>Murray</u>, 477 U.S. at 496). A petitioner must show "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." <u>McQuiggin v. Perkins</u>, 569 U.S. 383, 399 (2013) (internal quotation marks omitted) (quoting <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995)). For a petitioner to "pass through the gateway" and be permitted to argue the merits of his defaulted claims, he must show "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of non-harmless constitutional error." <u>Id</u>. at 401 (internal quotation marks omitted) (quoting <u>Schlup</u>, 513 U.S. at 316).

17

With these principles in mind, the Court turns to an examination of the claims raised in Keel's petition for habeas relief.

## IV. ANAYLSIS

### A. Applicability of AEDPA

Petitioner raises a threshold issue he labels "Claim 0." (Doc. 1, PageID.17-27). Petitioner asserts that Tennessee Code Annotated § 40-30-110(f), part of the state's post-conviction review statute, conflicts with Strickland v. Washington, 466 U.S. 668 (1984). Section 40-30-110(f) requires post-conviction petitioners in Tennessee courts to prove "allegations of fact by clear and convincing evidence." Strickland, on the other hand, requires that defendants demonstrate that their counsel performed deficiently by only a "preponderance of the evidence," and that they demonstrate prejudice by establishing "a reasonable probability" of a more favorable result. Id. at 698. Petitioner asserts that Tennessee's post-conviction scheme therefore imposes a more burdensome standard of review than that established by Supreme Court law.

Viewed as an independent ground seeking habeas relief, the Court notes that Petitioner did not present this argument to the to the TCCA in either of his post-conviction appeals. (Doc. 14-33, PageID.4644-82; Doc. 15-7, PageID.4969-5015). The claim is procedurally defaulted because Petitioner no longer has a means available to exhaust it. See Woodford, supra. Moreover, the claim is without merit because there is no constitutional right to state post-conviction review, and errors related to post-conviction review procedures do not create independent bases for granting habeas relief. See Cress v. Palmer, 484 F.3d 844, 853 (6th Cir. 2007) (citing Kirby v. Dutton, 794 F.2d 245, 246-47 (6th Cir. 1986) and Roe v. Baker, 316 F.3d 557, 571 (6th Cir. 2002)).

18

Though the argument does not provide an independent basis for granting habeas relief, it does not follow—as Respondent seems to assert—that the argument is irrelevant to the Court's review of the substantive claims raised by Petitioner in his state post-conviction proceeding. If it is true that the state court applied a "clear and convincing evidence" standard to decide whether Petitioner demonstrated that his counsel performed deficiently, such an error would mean that the ineffective assistance of counsel claim would clear the barrier set by 28 U.S.C. § 2254(d), and Petitioner would be entitled to de novo review of those claims. See Bryant v. Westbrooks, Case No. 3:15-0685, 2018 U.S. Dist. LEXIS 150668, *40-41, 2018 WL 4210784 (M.D. Tenn.) (adopted in relevant part at 2018 U.S. Dist. LEXIS 180833, 2018 WL 5255281 (M.D. Tenn. October 22, 2018) (finding that the Tennessee Supreme Court's explicit finding that "Defendant has failed to prove by clear and convincing evidence that trial counsel's [inaction] was deficient performance" resulted in the imposition of a stricter burden of proof than set forth in Strickland and was therefore contrary to the clearly established law and entitled Petitioner to de novo review).

Here, the post-conviction court recited the "clear and convincing evidence" standard in its opinion. (Doc. 15-1, PageID.4819). The court, also, however, gave a detailed summary of the Strickland standard, albeit without stating that Petitioner bore the burden of proof of showing deficient performance by a preponderance of the evidence. (Id. PageID.4819-21). So too, the TCCA recited the stricter burden of proof from § 40-30-110(f). (Doc. 15-10, PageID.5099). The TCCA likewise prefaced its analysis of Petitioner's ineffective assistance of counsel claims with a thorough summary of the Strickland standard without mentioning the preponderance of the evidence standard. (Id. PageID.5099-5102).

Nevertheless, unlike Bryant, neither state court explicitly stated that it rejected Petitioner's allegations of deficient performance because Petitioner did not establish his factual allegations by

19

clear and convincing evidence. Rather, the courts rejected the allegations because they viewed the alleged actions and omissions of counsel as reasonable ones. (Id. PageID.5104-10).

Federal habeas courts will not presume that a state court failed to comply with the constitutional dictates of the Supreme Court. See Bell v. Cone, 543 U.S. 447, 455 (2005); Early v. Paker, 537 U.S. 3, 8 (2002) (per curium). The application of this principle is especially appropriate where, as here, the state court explicitly recited the Strickland standard in its opinion. That the state court began its opinion by reciting the clear and convincing evidence standard, standing alone, does not show that the state court applied the incorrect standard. See Whitehair v. Tennessee, No. 20-cv-00917, 2024 U.S. Dist. LEXIS 175771, *23-28, 2024 WL 4314975 (M.D. Tenn., Aug. 6, 2024) (adopted in relevant part at 2024 U.S. Dist. LEXIS 174479, 2024 WL 4311504 (M.D. Tenn. September 26, 2024) (finding that TCCA's citation to the clear and convincing evidence standard was a reference to the petitioner's burden to prove factual allegations during the hearing in the post-conviction court under state law. Thus, the TCCA's decision, which recited the Strickland standard without explicitly reciting the preponderance of the evidence standard, nevertheless applied the appropriate standard and was subject to the AEDPA deferential standard).

As in Whitehare, the Court finds that the TCCA's opinion did not apply the incorrect standard of review to Petitioner's ineffective assistance of counsel claims. The state court recited Strickland for the standard governing the substantive claims of ineffective assistance of counsel. Nowhere in the opinion did the state court find that Petitioner failed to demonstrate entitlement to relief because he did not prove by "clear and convincing evidence" that his counsel performed ineffectively. The state court rejection of Petitioner's ineffective assistance of counsel claims is therefore subject to the deferential standard set forth in § 2254(d)(1).

20

B. Substantive Claims

1. Claim 1

Petitioner asserts that the attorney appointed to represent him for his motion for new trial and direct appeal rendered ineffective assistance of counsel.[2] (Doc. 1, PageID.28-34). Specifically, Petitioner asserts in his habeas petition that his counsel: (1) failed to adequately consult with him, (2) failed to raise a double-jeopardy claim in the motion for new trial, (3) before the second trial failed to provide the recording of the victim's phone call to the prosecutor so that it could be used to impeach her testimony, and (4) was more interested in protecting the forensic interviewer than representing Petitioner. Id. Petitioner procedurally defaulted these claims when he altered the set of factual allegations from the ones that were presented to the state courts during post-conviction proceedings.

As discussed above, the exhaustion doctrine requires that a petitioner fairly present his claims to the state courts before raising them in a federal habeas petition. Part of a fair presentation requires that the claims raised in a federal petition be based on the same facts and theories. See Duncan v. Henry, 513 U.S. 364, 366 (1995). Petitioner did not exhaust his present allegations of ineffective assistance of counsel because he altered the factual bases and theories he advances in this action from those that he presented to the TCCA during post-conviction review. As Tennessee Code Annotated § 40-30-102 (generally allowing only one post-conviction review petition and imposing a one-year limitations period) forecloses Petitioner from exhausting the present set of allegations, the claims are deemed procedurally defaulted. See Carruthers v. Mays, 889 F.3d 273, 288 (6th Cir. 2018).

---

[2] The same attorney represented Petitioner at his first trial and acted as elbow counsel while Petitioner represented himself at his second trial.

21

When Petitioner first raised his claims of ineffective assistance of counsel in the post-conviction court, he sought but was denied permission to personally testify regarding the issues he requested appellate counsel to raise on direct appeal. (Doc. 14-35, PageID.4729-28). As a result, in the first post-conviction proceeding before the TCCA, Petitioner claimed that he was denied a fair hearing on the claim. (Doc. 14-13, PageID.4648, 4661-67). Petitioner also set forth his particular allegations of ineffective assistance to the TCCA. (Doc. 14-13, PageID.4648, 4668-80). He claimed that his counsel was ineffective for: (1) failing to raise his double jeopardy claim, (Id. PageID.4654-60, 4672, 4678), (2) failing to object to the admission of an unedited police interview with Petitioner (Id. PageID.4668, 4671, 4678), (3) failing to obtain transcripts from the first trial to impeach the victim at the second trial, (Id. PageID.4669, 4673-74, 4678), (4) failing to raise a sufficiency of the evidence claim, (Id. PageID.4669, 4674, 4678), (5) failing to object to the admissibility of the prosecutor's expert witnesses, (Id. PageID.4669, 4674-75, 4678), (6) failing to object to the validity of the indictment, (Id. PageID.4669-70, 4675-76, 4678), (7) failing to turn over the victim's recorded telephone conversation to the prosecutor so that it could be used at trial, (Id. PageID.4670, 4676, 4678), and (8) failing to adequately communicate with Petitioner in preparation for the motion for new trial and direct appeal. (Id. PageID.4671-72, 4677). This list of allegations contains all the allegations contained in Petitioner's Claim 1, except allegation No. 4, asserting that counsel was motivated to protect the forensic interviewer.

However, the TCCA did not rule on the merits on any of these the ineffective assistance of counsel claims. Instead, it agreed that Petitioner was denied a full and fair hearing, (Doc. 14-35, PageID.4730-31), and it remanded the case for the post-conviction court to hold another hearing

22

at which Petitioner was permitted to testify in support of his claims. (Id. PageID.4733). After the remand hearing, the post-conviction court once again denied relief. (Doc. 15-1, PageID.4813-27).

Petitioner again appealed to the TCCA, and this time, through counsel, he raised a different set of allegations of ineffective assistance of counsel. He claimed that counsel: (1) during Petitioner's first trial, failed to impeach the victim with her recorded telephone statement and that had it been presented the first trial would likely have ended in an acquittal rather than a hung jury (Id. PageID.4983-85), (2) at the close of Petitioner's first trial, failed to move for a mistrial on grounds of prosecutorial misconduct so as to bar a retrial, (Id. PageID.4985-88), (3) failed to challenge the trial court's finding that the victim's recorded statement was inadmissible because it was not inconsistent with her trial testimony in the motion for new trial and direct appeal, (Id. PageID.4988-92), (4) failed to raise the admission of Petitioner's unredacted police interview in the motion for new trial and direct appeal, (Id. PageID.4993-95), (5) failed to challenge the admissibility of the forensic interview and prosecution expert witness testimony in the motion for new trial and direct appeal, (Id. PageID.4995-5005), (6) failed to raise a sufficiency of the evidence claim in the motion for new trial and direct appeal, (Id. PageID.5005), and (7) failed to raise the issue of Petitioner being prevented from impeaching the victim with her prior trial testimony (Id. PageID.5006-07).

This set of allegations, the only ones ruled on by the TCCA, is entirely different than the ones presented in Petitioner's current habeas petition. After the case returned to the TCCA from the remand hearing, Petitioner was required to raise his present allegations of ineffective assistance of counsel to fairly present them to the state courts. See, e.g., Hernandez-Ayala v. LeGrand, 13-cv-00134, 2018 U.S. Dist. LEXIS 17176, *5 (D. Nev. February 2, 2018). Petitioner did not assert in his second submission to the TCCA that his appellate counsel failed to adequately consult with

him. He asserted that counsel trial was ineffective for failing to move for a mistrial after the first trial to setup a double jeopardy bar to a second trial, but he did not assert that counsel was ineffective for failing to raise a double jeopardy claim in the motion for new trial or direct appeal. Similarly, Petitioner raised a claim that counsel failed to impeach the victim with her recorded phone conversation at the <u>first</u> trial, but he failed to raise a claim that trial counsel failed to provide a copy of the recording to the prosecutor prior to the <u>second</u> trial. Finally, Petitioner did not assert to the TCCA in the second post-conviction review appeal that counsel was protecting the forensic interviewer. In summary, after the remand hearing, Petitioner did not raise any of his current allegations of ineffective assistance in the TCCA.

Petitioner cannot demonstrate that his post-conviction counsel was ineffective for failing to raise his current allegations to excuse the default. Counsel did not perform deficiently for failing to raise claims that were not "clearly stronger" than the ones he raised in the second round in the TCCA. <u>Fry v. Shoop</u>, 124 F.4th 1019, 2025 U.S. App. LEXIS 87, *16 (6th Cir. 2025) (citing <u>Joshua v. DeWitt</u>, 341 F.3d 430, 441 (6th Cir. 2003). As outlined above, post-conviction review counsel raised numerous other allegations of ineffective assistance in the TCCA, and none of Petitioner's current allegations are clearly stronger than the ones raised by his counsel.

Petitioner asserts that his counsel failed to raise a double jeopardy claim in the motion for new trial, but as explained in more detail below in Section IV(B)(2) of this opinion, the allegation is frivolous because his first trial ended as the result of a hung jury and not because of prosecutorial misconduct.

Petitioner asserts that his counsel was ineffective for failing to provide the prosecutor with a copy of the victim's recorded phone conversation prior to the second trial, but Petitioner was proceeding in pro per at his second trial and did not have the right to effective assistance of elbow

24

counsel. See McKaskle v. Wiggins, 465 U.S. 168, 183 (1984); Wilson v. Parker, 515 F.3d 682, 697 (6th Cir. 2008). Petitioner's current version of this claim is not clearly stronger than post-conviction counsel's version that focused on counsel's failure to properly present the claim at the motion for new trial – a point in the proceedings after which counsel had been appointed to represent Petitioner. (Doc. 14-29, PageID.4512-13) (summarizing timeline of counsel's representation of Petitioner).

Similarly, Petitioner's claims that counsel was more concerned about protecting the forensic interviewer and that he insufficiently consulted with Petitioner about his appeal do not contain concrete allegations of actual prejudice. Indeed, the allegations were opposed by counsel's testimony that he met with Petitioner on a weekly basis about his appeal. (Doc. 14-29, PageID.4516-17).

Petitioner's current allegations are not clearly stronger than the more concrete ones raised by post-conviction counsel. Accordingly, Petitioner's first claim for relief is procedurally barred, and Petitioner has failed to demonstrate cause to excuse the default.

## 2. Claim 2

Petitioner asserts that his second trial was barred by the Double Jeopardy Clause. He claims that the prosecutor committed misconduct during closing argument and that such misconduct should have barred a retrial. (Doc. 1, PageID.35-52).

Petitioner's post-conviction counsel presented the TCCA with a claim that counsel was ineffective for failing to move for a mistrial at the first trial so as to give rise to a double jeopardy bar to a second trial, but he did not raise a free-standing double jeopardy claim. (Doc. 15-17, PageID.4971). Nor was the claim raised by Petitioner on direct appeal. (Doc. 14-19). The claim is

therefore inexcusably defaulted for the reason discussed in the previous section. <u>Carruthers</u>, 889 F.3d at 288.

Nevertheless, the claim is without merit. Consistent with the Double Jeopardy Clause of the Fifth Amendment, a trial can be discontinued without barring a subsequent one when "particular circumstances manifest a necessity" to declare a mistrial. <u>Wade v. Hunter</u>, 336 U.S. 684, 690 (1949). The inability of a jury to reach a verdict has long been considered the "classic basis" establishing manifest necessity. <u>Arizona v. Washington</u>, 434 U.S. 497, 509 (1978). Here, Petitioner's first trial resulted in a mistrial on exactly this basis - the jury was unable to reach a verdict. (Doc. 14-2, PageID.3066).

Petitioner claims that the prosecutor's misconduct during closing argument at his first trial was so prejudicial that retrial should have been barred anyway. That assertion results from a fundamental misunderstanding of precedent. It is true that where a prosecutor's misconduct is intended "to provoke the defendant into moving for a mistrial," and a mistrial is granted on those grounds, the defendant "may invoke the bar of double jeopardy in a second effort to try him." <u>See</u> <u>Oregon v. Kennedy</u>, 456 U.S. 667, 679 (1982).

But whether or not Petition would have been able to establish that the prosecutor was attempting to goad Petitioner into moving for a mistrial, no such motion was made. Instead, Petitioner allowed the case to proceed to the jury, and the mistrial was declared because it was unable to reach a verdict - not because of any alleged misconduct.

Accordingly, Petitioner's double jeopardy claim is procedurally defaulted and without merit.

3. Claim 3

Petitioner asserts that the trial court erroneously denied his request to use Dr. William Bernet as a rebuttal expert. Petitioner argues that Bernet's testimony was necessary to inform the jury about factors to consider in deciding whether the victim's accounts of sexual abuse were the product of improper suggestion. (Doc. 1, PageID.53-81).

Petitioner presented this claim to the TCCA on direct appeal. (Doc. 14-17, PageID.4233-40.) Petitioner asserted in the TCCA that the trial court erred in applying Tennessee evidentiary rules in finding the proposed testimony inadmissible. Petitioner did not assert that the exclusion of the testimony violated any of Petitioner's federal rights. Id. Thus, as before, any claim that Petitioner's federal constitutional rights were violated by the trial court's decision is unexhausted and defaulted. Carruthers, 889 F.3d at 288.

To the extent Petitioner continues to assert his state-evidentiary claim here, the claim is not cognizable on federal habeas review. See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991), Marshall v. Lonberger, 459 U.S. 422, 438, n. 6 (1983).

To the extent Petitioner is attempting to transform his claim into a federal one, besides being unexhausted and defaulted, it fails because it cannot be supported by established law. See McGowan v. Winn, No. 17-2000, 2018 U.S. App. LEXIS 37111, 2018 WL 1414902, at *2 (6th Cir. Mar. 21, 2018) (Supreme Court has not extended the right to the appointment of defense experts beyond the right to one testifying as to defendant's sanity); Morva v. Zook, 821 F. 3d 517, 524-25 (4th Cir. 2016) (same). Though review of such a claim would not be constrained by §2254(d) deference because it was not adjudicated on the merits by the state court, habeas relief would nevertheless be barred on anti-retroactivity grounds. See Weeks v. Angelone, 176 F. 3d 249, 264-65 (4th Cir. 1999).

27

Petitioner therefore fails to demonstrate entitlement to habeas relief with respect to this claim.

4. Claim 4

Petitioner asserts that the trial court erred in failing to consider Tennessee Compiled Law § 24-7-123 in deciding whether to admit the forensic interview of the victim performed by Gwen Hutcheson. He asserts that the forensic interview involved suggestive questioning. Petitioner does not raise a separate claim that his appellate counsel was ineffective for failing to raise this claim on appeal. (Doc. 1, PageID.82-85).

This claim was raised by Petitioner in his post-conviction review proceeding. In his brief in the TCCA, Petitioner asserted that the trial court misapplied state law under § 24-7-123. Petitioner did not present a claim that admission of the testimony violated federal law, though he asserted that appellate counsel was ineffective for failing to raise it in the motion for new trial or on direct appeal. (Doc. 15-7, PageID.5002-05.) The TCCA found that counsel was not ineffective for failing to raise the issue because the claim was unpreserved, and "Petitioner could not demonstrate that a clear and unequivocal rule of law was breached or that a substantial right was adversely affected." (ECF No. 15-10, PageID.5108-09).

With respect to the direct challenge to the admission of the forensic interview under Tennessee law, the claim does not provide a cognizable basis for granting federal habeas relief. See, e.g., Davis v. Genovese, No. 21-58162022, U.S. App. LEXIS 15595, *4, 2022 WL 16545359 (6th Cir. June 6, 2022) (denying certificate of appealabililty on claim that trial court's admission of the victim's videotaped forensic interview violated Tennessee state law).

With respect to any claim that appellate counsel was ineffective for failing to raise the challenge in the motion for new trial or direct appeal, the TCCA reasonably found that counsel was not ineffective for failing to raise this unpreserved state-law claim of error. No basis exists for this Court to conclude that the trial court erred under Tennessee law in admitting the evidence. The TCCA specifically found that Petitioner failed to demonstrate that a "rule of law was breached." Appellate counsel did not perform deficiently for failing to raise a meritless claim on appeal. See Davis v. Straub, 430 F.3d 281, 290–91 (6th Cir. 2005) (habeas relief precluded on ineffective assistance of counsel claim where it would require a determination that the state court erred in applying its own law).

### 5. Claim 5

In a related claim, Petitioner asserts that the prosecution experts—Ms. Alexander and Ms. Litrell—were erroneously allowed to testify that the forensic interview technique used in this case was proper and that it is not uncommon for a child victim to lie and say that a sexual assault did not occur. Petitioner asserts that his elbow counsel was ineffective for failing to object to admission of the testimony, and that the testimony invaded the province of the jury by effectively vouching for the credibility of the victim. (Doc. 1, PageID.86-104).

This claim was raised in the state courts in the TCCA on post-conviction review, focusing on the allegation that the testimony improperly invaded the province of the jury contrary to State v. Schimpf, 782 S.W.2d 186, 194 (Tenn. Crim. App. 1989). As with Petitioner's previous claim, he did not present the TCCA with an argument that admission of the expert testimony violated his federal constitutional rights. Petitioner did assert, however, that appellate counsel was ineffective

for failing to raise the claim in the motion for new trial or direct appeal. (ECF No. 15-7, PageID.4995-5002).

The TCCA, again in the context of ruling on the ineffective assistance of counsel claim, agreed with the post-conviction court that Petitioner "failed to provide any legal basis that would have prohibited the testimony of the State's expert witnesses at trial[.]" (Doc. 15-10, PageID.5107).

As with the previous claim, Petitioner's underlying argument that the expert testimony was erroneously admitted under Tennessee law is not cognizable. See Haak v. Smith, No. 16-1457, 2016 U.S. App. LEXIS 20759, *9 (6th Cir. October 14, 2016) (claim trial court erred in qualifying and admitting expert testimony not cognizable); Meriweather v. Burton, No. 15-1126, 2015 U.S. App. LEXIS 20917, *7, 2015 WL 7450068 (6th Cir. November 24, 2015) (claim that trial court erroneously admitted expert testimony that improperly vouched for the victim's credibility not cognizable).

If Petitioner is presenting the associated ineffective assistance of trial or appellate counsel claim, it fails because the state court rejected the state-law predicate supporting it. Davis, supra.

Petitioner therefore fails to demonstrate entitlement to relief with respect to this claim.


6. Claim 6

Petitioner claims that the trial court erred when it denied his motion for a new trial after the prosecutor played Petitioner's entire police interview with Detective Ferrell. Petitioner asserts that the jury heard statements made by the detective that had been ordered to be redacted. Petitioner also claims that his counsel was ineffective for omitting this claim from his direct appeal after he had raised it in the motion for new trial. (Doc. 1, PageID.105-12).

The trial record indicates that there was a discussion immediately before the detective's testimony regarding the use of a redacted recording of Petitioner's police interview. (Doc. 14-9, PageID.3670-71). After the detective's testimony established a foundation, the prosecutor began playing the recording but then stopped it. (Id. PageID.3678). The prosecutor stated, "my question is whether this is the correct redacted version, we are afraid we are about to get into something that we don't want to. . . . Nothing that has come out has been any problem, but General wants to make sure before we play more." (Id. PageID.3679). The court recessed the case, and the jury was excused. (Id. PageID.3680-81).

The prosecutor stated:

> General Butler: . . . I want to apologize to you and to the defendant it was not obviously intentional. However, normally this type of information come in regardless. It is police tactic and I think that this can easily be cured as it would be in any other case by a jury instruction, instructing them that his opinions are not to be taken for anything other than a police tactic.

(Id. PageID.3682).

The jury was brought back, and the court instructed them not to consider the detective's statements during the interview:

> Detective Farrell was interviewing Mr. Keel and in some parts of it is giving his opinion about what he thinks and who is telling the truth and who is not telling the truth and that is a detective strategy a lot of times that is used in a case. . . . The only thing you should consider when you think about that recording is what the defendant is saying, that is what is the probative thing that you would consider and so Detective Farrell's opinions and all that isn't evidence and that is not anything that you would think of that is having any probative value as far as the truth of the evidence that you would need to consider. . . .

(Id. PageID.3685-86).

On post-conviction review, the TCCA denied relief with respect to the claim as follows:

> In denying relief on the basis of this allegation, the post-conviction court noted trial counsel's testimony that he believed the playing of the unredacted interview was unintentional and that the trial court appropriately addressed the issue

in its curative instruction to the jury. The post-conviction court then concluded that trial counsel exercised his professional judgment and was not deficient in his representation for not raising the issue on appeal.

The record supports the findings and conclusions of the post-conviction court. There is no evidence that would suggest that trial counsel was wrong in his assessment that the playing of the unredacted interview was anything other than inadvertent, or that the error was not appropriately handled by the trial court in its curative jury instruction. As such, the Petitioner cannot show that trial counsel provided ineffective assistance by not raising this issue on appeal.

(Doc. 15-10, PageID.5107).

This decision did not unreasonably apply clearly established Supreme Court law. As an initial matter, there is no clearly established Supreme Court authority prohibiting a police officer from offering an opinion regarding a criminal defendant's guilt or innocence. See Simpson v. Barrett, No. 16-cv-13909, 2022 U.S. Dist. LEXIS 63696, *12, 2022 WL 1019219 (E.D. Mich. April 5, 2022). That the jury heard the detective tell Petitioner that he believed him to be guilty, standing alone, did not violate clearly established Supreme Court law.

To the extent Petitioner claims that the prosecutor deliberately elicited inadmissible opinion evidence, clearly established Supreme Court law asks whether the prosecutor's improper conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). The Supreme Court has described the Darden standard as "a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations.'" Parker v. Matthews, 567 U.S. 37, 48 (2012). A trial court's curative instructions therefore may "cure any prejudice" that results from a prosecutor's improper comments. See, e.g., United States v. Kurlemann, 736 F.3d 439, 452 (6th Cir. 2013). Further, reviewing courts are directed to presume that a jury follows a trial court's instructions. See Samia v. United States, 599 U.S. 635, 646 (2023).

32

It was not objectively unreasonable for the TCCA to conclude that Petitioner failed to demonstrate entitlement to relief for his counsel's failure to raise a prosecutorial misconduct claim on direct appeal. As already indicated above, counsel is not ineffective for omitting weak claims on appeal. See, e.g., Mahdi v. Bagley, 522 F.3d 631, 638 (6th Cir. 2008) ("No prejudice flows from the failure to raise a meritless claim."). The TCCA reasonably determined, as a factual matter, that the record supported the post-conviction court's finding that the playing of the unredacted interview was inadvertent. See 28 U.S.C. § 2254(d)(2). Furthermore, established Supreme Court law supports the TCCA's conclusion that a curative instruct was sufficient to cure any prejudice and that a mistrial was not mandated. Samia, supra. Therefore, it did not involve an unreasonably application of clearly established Supreme Court law for the TCCA to conclude that appellate counsel was not required to press this claim on direct appeal. Petitioner fails to demonstrate entitlement to relief under § 2254(d).

7. Claims 7 and 8

Petitioner's seventh claim asserts that the post-conviction court erred in denying his request to provide him with video and audio recordings of his first and second trials. Petitioner asserts that portions of the victim's testimony are missing from the transcripts. He also asserts that the detective admitted at trial that he never obtained a warrant for Petitioner's arrest and that it is not his signature that appears on the indictment, but those passages are also missing from the transcript. (Doc. 1, PageID.113-121). Petitioner's related eighth claim asserts that he was denied access to video and audio or the minutes of the grand jury proceedings. He asserts that the records would show that the case was never presented to the grand jury and that the indictment was forged. (Id. PageID.122-131).

The TCCA rejected the claims on the merits in its first opinion on post-conviction review

prior to ordering the remand hearing:

> Although we are remanding the case to allow the Petitioner the opportunity
> to testify, in an attempt to assist the post-conviction court in resolving this case
> expeditiously, we address the Petitioner's challenges to the post-conviction court's
> denial of the Petitioner's: (1) motion to inspect the grand jury minutes and recording
> of indictments, (2) motion to obtain a recording of the first and second trials, (3)
> motion to obtain a recording of the July 2015 hearing; and (4) request to recall
> Counsel to testify at the third hearing.
>
> It is within the court's discretion to determine whether the proffered
> evidence is relevant. State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App.
> 1995). In this case we conclude that the post-conviction court acted within its
> discretion in denying each of these motions. The Petitioner sought to inspect the
> grand jury minutes and recording of the indictments. The record reflects that in
> denying the Petitioner's motion, the trial court found he was not entitled to grand
> jury records. With certain exceptions, grand jury proceedings are to remain secret.
> See TENN. R. CRIM. P. 6(k)(1) (stating that grand jury proceedings should be kept
> secret). The State is not required to record grand jury proceedings and, as such, did
> not record the proceedings for which the Petitioner sought a recording. Thus, the
> State had nothing to provide to the Petitioner.
>
> The Petitioner also sought a recording of both trials; however, the Petitioner
> possessed two certified copies of the trial transcripts. The Petitioner's seeks the
> recordings to show a discrepancy between the recording and the transcript. The
> Petitioner, however, presented no evidence, other than his bare assertion, to support
> the allegation that the transcripts were flawed. The post-conviction court properly
> denied this motion.

(Doc. 14-35, PageID.4731-32).

First, the Court notes that Petitioner's appellate counsel had access to the trial transcripts

for preparation of Petitioner's direct appeal. See Williams v. Oklahoma City, 395 U.S. 458, 459-

60 (1969) (State must provide indigent defendant with a transcript of prior proceedings when

needed for direct appeal). That is all clearly established Supreme Court precedent required. It is

also clear that Petitioner is presently in possession of an unreacted copy of his trial transcripts.

(See Doc. 1-10, Exhibit J. PageID.711-1083).

The claim that Petitioner is entitled to the video or audio recordings of his trials fails because it cannot be supported by clearly established Supreme Court law. Petitioner has no constitutional right to the production of additional transcripts or materials to support his post-conviction review claims. Rickard v. Burton, 2 F. App'x 469, 470 (6th Cir. 2001) (citing Ruark v. Gunter, 958 F.2d 318, 319 (10th Cir. 1992); United States v. MacCollom, 426 U.S. 317, 325-26 (1976)). The rule in MacCollom applies to a plaintiff seeking access to criminal court records to launch a collateral attack on his or her criminal conviction. See, e.g., Reed v. Gonzalez, No. 16-14255, 2017 U.S. Dist. LEXIS 7187, 2017 WL 227959, at * 2 (E.D. Mich. Jan. 19, 2017).

The TCCA's rejection of this claim therefore comported with dictates of established Supreme Court law and does not provide a basis for granting habeas relief.

8. Claim 9

Petitioner claims that he was denied the right to cross examine the victim at the second trial with inconsistent testimony she gave at the first trial. The petition does not develop the allegation by asserting how the victim's testimony differed, stating only vaguely that she gave "several different stories." (Doc. 1, PageID.132-140).

A version of this claim with more specific allegations of inconsistent testimony was raised in the TCCA on post-conviction review as an ineffective assistance of appellate counsel claim. Petitioner asserted that the victim admitted at the first trial that she had "lived in Wilson County at a certain point," but didn't do so at the second trial. (Doc. No. 15-7, PageID.5007).

The TCCA found that review of the claim was waived when Petitioner failed to develop a record in support of the allegation at the post-conviction hearing:

> The Petitioner argues that trial counsel provided ineffective assistance by
> not raising as an issue in the motion for new trial and on appeal whether the trial

court erred by not allowing him to impeach the victim with her testimony from his first trial. The trial transcript reflects that the trial court quickly put an end to the Petitioner's attempts to do so, admonishing the Petitioner that the jury was not to even know that there had been a previous trial. Although the Petitioner alleged in his petition that trial counsel was ineffective for not raising the issue on appeal, he offered no testimony in support of the allegation during his evidentiary hearing, and the post-conviction court did not address it in its order denying the petition. As such, we conclude that the Petitioner has waived our consideration of this issue on appeal. "'[I]ssues not addressed in the post-conviction court will generally not be addressed on appeal.'" <u>Lane v. State</u>, 316 S.W.3d 555, 561-62 (Tenn. 2010) (quoting <u>Walsh v. State</u>, 166 S.W.3d 641, 645-46 (Tenn. 2005)).

(Doc. 15-10, PageID.5109).

Petitioner's presentation of this claim to the state courts resulted in two procedural defaults. First, at neither post-conviction evidentiary hearing did Petitioner present any evidence in support of this claim. As a result, citing <u>Lane</u>, <u>supra</u>, the TCCA determined that Petitioner waived review of the claim by failing to offer support for it to the post-conviction court. This constituted the invocation of an adequate and independent state procedural ground on which the TCCA rested its denial of relief. <u>See, e.g., Curtis v. Boyd</u>, No. 20-00559, 2023 U.S. Dist. LEXIS 53835, *100-01, 2023 WL 2699973 (M.D. Tenn. March 29, 2023) (citing <u>Monzo v. Edwards</u>, 281 F.3d 568, 576 (6th Cir. 2002)).

Second, the claim was presented to the TCCA as a claim of ineffective assistance of counsel for appellate counsel's failure to raise the underlying denial of the right to cross-examine issue in the motion for new trial or direct appeal. (Doc. 15-7, PageID.4972, 5006-07). The underlying substantive claim was not raised as an independent claim for relief. As explained earlier in this opinion, the doctrine of exhaustion mandates that the same claim under the same theory be presented to the state courts before it can be raised in a federal habeas petition. <u>Duncan</u>, 513 U.S. at 366. Presenting an ineffective assistance of appellate counsel claim to the state courts does not exhaust the underlying substantive claim of error. <u>See</u> <u>Davie v. Mitchell</u>, 547 F.3d 297, 312 (6th

Cir. 2008); see also Wogenstahl v. Mitchell, 668 F.3d 307, 343 (6th Cir. 2012), and White v. Mitchell, 431 F.3d 517, 526 (6th Cir. 2005).

Petitioner fails to demonstrate the requisite prejudice to overcome his defaults. "Prejudice, for purposes of procedural default analysis, requires a showing that the default of the claim not merely created a possibility of prejudice to the defendant, but that it worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimensions." Jamison v. Collins, 291 F.3d 380, 388 (6th Cir. 2002) (citing Frady, 456 U.S. at 170-71). Habeas petitioners cannot rely on conclusory assertions of prejudice to overcome procedural default. Rather, "they must present affirmative evidence or argument as to the precise . . . prejudice produced." Lundgren v. Mitchell, 440 F.3d 754, 764 (6th Cir. 2006) (citing Tinsley v. Million, 399 F.3d 796, 806 (6th Cir. 2005)).

The victim testified at trial that at the time of the first incident, she lived with her grandmother at her duplex in Nashville. (Doc. 14-5, PageID.3255). She was ten or eleven years old at the time, and she described how Petitioner put his penis in her mouth in a room on her mother's side of the duplex. (Id. PageID.3257-69). A second incident of forced oral sex happened when the victim lived with her mother and Petitioner at a house in Donelson. The victim had slept over that weekend at her grandmother's duplex. The next morning, Petitioner drove her to school from the duplex. On the way, the victim told Petitioner that she needed to use the restroom, so Petitioner drove her to the Donelson home. When the victim came out of the bathroom, Petitioner forced her back inside and placed his penis in her mouth. (Id. PageID.3270-74).

On cross-examination, Petitioner asked the victim which school she attended when she came back into her mother's custody in December 2010. The victim said, "Donelson or Gra-Mar." (Id. PageID.3301). Petitioner asked the victim if she ever attended Carroll Oakland Middle School,

37

and the victim answered, "I don't remember a school named that." (Id. PageID.3302). Petitioner asked the victim if she would dispute records showing that she attended that school from December 14, 2010, all the way to August 2010 (sic 2011?)." (Id. PageID.3302). The victim testified that she did not remember attending that school. (Id. PageID.3303). The victim acknowledged that she lived with Petitioner and her mother in Lebanon for a time, but she didn't remember going to a school there. (Id. PageID.3308-10).

At the following trial date, with the victim still on the stand, Petitioner sought to introduce a written timeline he prepared. (Doc. 114-6, PageId.3361-62). He said it would prove that the incidents did not occur because the victim "did live in Wilson County . . . we never lived next door to the grandmother." (Id. PageID.3362). Petitioner added that the victim had contradicted her testimony from the first trial. (Id. PageID.3363-64). The trial court stated that "we are not going to get into any previous trial transcript. . . . They are not even [going] to know that there was a previous trial. . . . That would be improper." (Id. PageID.3364). Petitioner asked if he could submit school records, but the court ruled that he could not do so through this witness. (Id. PageID.3366).

On re-direct examination, the victim clarified the timeline of her living arrangements. She testified that from January to March 2011, she lived at her grandmother's duplex. She then moved to Donelson with her mother and Petitioner and lived there for "just a couple months" until they were kicked out. She then moved back to her grandmother's duplex. At "some point" they moved to Lebanon, but they got kicked out of the trailer when her mom went to jail and "Billy ran off." The victim then moved back in with her grandmother. (Id. PageID.3419-20).[3]

---

[3] The victim's grandmother testified that her daughter, grandchildren, and Petitioner lived at her house "pretty much their whole relationship . . . years." (Doc. 14-7, PageID.3435). On cross-examination, Petitioner showed the grandmother the timeline he prepared, and she agreed that they lived with her in Nashville from May 2010 until June 2011, but she clarified that they were also "in and out, not like it was the full, full time that you got there." (Id. PageID.3454). The

On cross-examination, the victim clarified that she did not "remember the exact order like what was before either Lebanon or Donelson," but she confirmed that she lived with her grandmother a majority of the time during that period. (Id. PageID.3423-24).

Thereafter during the trial, Petitioner did not attempt to admit evidence to establish that the victim never resided at her grandmother's home in Donaldson County.

In light of this record, Petitioner fails to show that his inability to cross-examine the victim with her prior testimony worked to his actual and substantial disadvantage and infected his entire trial with errors of constitutional dimensions. Jamison, 291 F.3d at 388. First, according to post-conviction counsel, the prior inconsistent statement merely amounted to an admission by the victim that she had "lived in Wilson County at a certain point." (Doc. No. 15-7, PageID.5007). The victim's trial testimony was not inconsistent with this statement. She testified that she lived with her mother and Petitioner in a trailer in Wilson County until her mother went to jail and Petitioner ran off. Even if the victim testified at the first trial that she attended middle school in Wilson County for a time, that would not be inconsistent with her testimony during the second trial that she no longer remembered that fact.

Moreover, even if Petitioner established that the victim lived and attended school in Wilson County, it would do nothing in itself to undermine her testimony that the incidents took place when she lived at her grandmother's duplex in Nashville and then again when she briefly resided in Donelson. The victim did not remember the dates of the incidents, and the indictment covered a period between January 1, 2011, and March 18, 2012. (Doc. 14-1, PageID.2825).

_____

grandmother was unaware whether the victim attended a middle school in Wilson County, and she recalled the victim visiting the residence in Wilson County, but she couldn't remember the dates she resided there, if at all. (Id. PageID.3456-57).

39

If, as Petitioner suggested at trial, the family never resided with the grandmother in Nashville to discredit the victim's account of the first incident, he had the opportunity to present such evidence of residence but failed to do so. His inability to cross-examine the victim with alleged prior testimony that she attended a school in Wilson County was far less impactful in preventing him from presenting this line of defense than was his own failure to present evidence that the victim never resided with her grandmother.

Nor does Petitioner really offer specific allegations of prejudice with respect to this claim in this action.[4] The petition asserts vaguely that the victim provided "several different stories" at the two trials. (Doc. 1, PageID.132-140). He does not state how the accounts differed. Neither Petitioner's unfounded assertion of prejudice presented to the state courts on post-conviction review nor his conclusory assertion of prejudice in his habeas petition are insufficient to overcome the procedural default of this claim. Lundgren, supra.


9. Claim 10

Petitioner claims that his appellate counsel was ineffective for failing to raise a challenge to the sufficiency of the evidence presented at trial on direct appeal. Specifically, he asserts that the victim gave false testimony at his second trial, and that the prosecution experts' testimony should have been suppressed. Petitioner asserts that the victim admitted to falsely accusing Petitioner in a recorded phone conversation, showing that her testimony was false. (Doc. 1, PageID.141-154).

---

[4] Petitioner asserts that Tennessee Department of Children's Services records prove that the family lived in Wilson County during the relevant period. (ECF No. 15-18, PageID.5372). As will be discussed below in Section IV(B)(11), the records do not support that assertion.

40

As indicated, appellate counsel cannot be deemed ineffective for failing to raise a meritless claim on appeal. Mahdi, 522 F.3d at 638. Petitioner's sufficiency of the evidence claim is meritless because it does not truly challenge the legal sufficiency of the evidence.

The Federal Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). The question on a sufficiency of the evidence claim is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). "[I]t is the responsibility of the jury - not the court - to decide what conclusions should be drawn from the evidence admitted at trial." Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam). "A reviewing court does not re-weigh the evidence or re-determine the credibility of the witnesses whose demeanor has been observed by the trial court." Matthews v. Abramajtys, 319 F.3d 780, 788 (6th Cir. 2003) (citing Marshall v. Lonberger, 459 U.S. 422, 434 (1983)). Accordingly, the "mere existence of sufficient evidence to convict . . . defeats a petitioner's claim." Matthews, 319 F.3d at 788-789.

Here, as discussed, the evidence presented at trial included the victim's testimony describing how Petitioner raped her. (Doc. 14-5, PageID.3258-73). Petitioner asserts inconsistencies and improper bolstering of the vicitim's testimony. But discrepancies in a witness's testimony "are irrelevant to the sufficiency of the evidence analysis because they improperly ask [the court] to weigh the evidence or to assess [the witness's] credibility." United States v. Sanders, 404 F.3d 980, 987 (6th Cir. 2005) (citation omitted); see also Martin v. Mitchell, 280 F.3d 594, 618 (6th Cir. 2002) (attacks on witness credibility challenge the quality, but not the sufficiency, of the government's evidence). It is enough that the victim testified to each element of the offense to

defeat Petitioner's claim. See Tucker v. Palmer, 541 F.3d 652, 658 (6th Cir. 2008) (citing cases). Petitioner therefore fails to demonstrate that his counsel was ineffective for failing to raise a sufficiency of the evidence claim on direct appeal.

10. Claim 11

Petitioner's eleventh claim concerns a recorded phone conversation between the victim and her mother. Petitioner asserts that the victim admitted to her mother during the call that she falsely accused Petitioner. The trial court excluded the recording because it was not provided to the prosecutor prior to trial in violation of discovery rules and because the statements made by the victim in the recording were not inconsistent with her trial testimony. (Doc. 14-6, PageID.3343-44).

Petitioner raises several arguments based on the recording. He asserts that his right to confrontation and to present a defense were violated when he was prohibited from presenting the recording at trial. He also asserts that elbow counsel failed to comply with the trial court's order to provide the recording to the prosecutor prior to trial, creating the basis for the objection. Finally, he asserts that the recording demonstrates that the prosecutor allowed the victim to offer false testimony against him. (Doc. 1, PageID.155-168).

None of these claims were raised on direct appeal. On post-conviction review in the TCCA, the issue was raised on different legal bases. Petitioner asserted that his trial counsel was ineffective during his first trial for failing to impeach the victim with recording, and that his appellate counsel was ineffective for failing to challenge the trial court's ruling that the recording was inadmissible during his second trial. (Doc. 15-7, PageID. 4983-85, 4988-92).

As with many of Petitioner's previous claims, this claim is procedurally defaulted because he did not exhaust the claim based on the legal theories he now presents in his habeas petition. <u>Carruthers</u>, 889 F.3d at 288.

Petitioner cannot show that actual prejudice would result from imposing a procedural bar to review of this claim because a fair reading of the recording shows that it was nowhere near as beneficial to the defense as Petitioner claims. Petitioner proffers what purports to be a transcript of the recording in question. (Doc. 1-10, PageID.706-10). It is not clear who prepared the transcript, but it is apparent that it does not include the entire phone conversation.

The transcript begins with a passage that Petitioner characterizes as an admission by the victim that she falsely accused Petitioner. The victim's mother asks her: "O.K. so V.S. whenever I talked to you yesterday when I was at the mile long yard sale and you said something about if you told the truth that it didn't happen that meme said you would go to jail is that right?" The victim responded, "Yes." (<u>Id.</u> PageID.706).

Even standing on its own, it is unclear that this statement constitutes an acknowledgment by the victim that she previously told her mother that if she told the truth that "it" didn't happen, her grandmother warned her that she would go to jail. A more natural interpretation of the exchange is that the victim was acknowledging that her mother was referring to a conversation they had the day before, without the victim agreeing that she made the prior statement that the truth was that Petitioner didn't do it.

This later interpretation is strongly borne out by the rest of the conversation. The victim went on to state, "tell [Petitioner] that uh I said I forgive him for what he did an um that he better be lucky that I didn't tell the DCS or whatever." (<u>Id.</u> PageID.707). When her mother asked the victim what she meant by that, she replied "oh you know what Bill did don't you?" (<u>Id.</u>) The victim

then said she couldn't say anything, though, because her grandmother was around. (Id.) When her mother said, "It sounds like their (sic) making you say stuff, the victim responded "naw," and that "only you can hear me right now." (Id. PageID.708). The conversion then turned to a discussion about whether the victim overheard a conversation during which another person said she had been sexually molested as a child. (Id. PageID.709-10).

In addressing the claim, the TCCA listened to the recording itself and similarly found that the conversation was not as beneficial to the defense as asserted by Petitioner:

> The Phone Call Recording consists of a brief snippet of what was clearly a longer conversation. In the clip, a woman, presumably the victim's mother, asks, "Whenever I talked to you yesterday when I was at the mile-long yard sale and you said something about if you told the truth that it didn't happen, that Meme said you would go to jail. Is that right?" A child, presumably the victim, says in a slightly exasperated tone, "Yes."[2] The same CD contains two additional portions of a telephone conversation between the victim and the victim's mother. In the second recorded clip, the victim's mother, again asking leading questions, and in a slightly badgering tone, unsuccessfully attempts to get the victim to admit that the victim overheard a conversation between a neighbor and the neighbor's boyfriend in which the neighbor spoke of having been molested by "some guy" when she was a young child. In the third recorded clip, the victim and her mother hold a longer conversation about what each is doing. At the beginning of the clip, the victim says to "tell Billy I forgive him for what he did."

> \*\*\*

> As the trial court observed in its ruling, there were a number of valid reasons to exclude the Phone Call Recording from trial, not the least of which was the Petitioner's failure to provide a copy to the State in discovery. Moreover, the small snippet of conversation that the Petitioner asserts contains the victim's recantation would not have necessarily helped his case, whereas the additional portions of conversation would have clearly been detrimental. Even assuming, arguendo, that the Petitioner could have authenticated the recording, under the rule of completeness he would not have been allowed to pick and choose only those one or two sentences that he believed would be beneficial. See TENN. RULE EVID. 106. Undoubtedly, that is the reason trial counsel wisely chose not to attempt to introduce the recording at the first trial. Because there was no merit to this issue, the Petitioner cannot show that trial counsel provided ineffective assistance by not raising the exclusion of the Phone Call Recording as an issue in the motion for new trial and on appeal.

—

44

[2] Given the nature of the recording, which clearly contains edited snippets of a longer conversation, we have purposefully avoided characterizing the "yes" by the victim as an answer to the question.

(Doc. 15-10, PageID.5105-06).

So too, Petitioner's appellate counsel testified at the post-conviction hearing that he decided not to raise any issue related to the recording because he did not believe that the material was beneficial to the defense. (Doc. 14-29, PageID.4525). Counsel, who also represented Petitioner during his first trial, explained that he "listened to the recording a lot. I don't believe she made any admissions, concessions, or anything along those lines that was, that would have been favorable to Mr. Keel." As a result, he made a strategic decision not to use the recording at the first trial. Id.

Petitioner exaggerates the exculpatory value of the recording. At trial, the victim acknowledged on cross-examination that her grandmother warned her that she might go to jail if she told the authorities "anything different" from what she previously told them. (Doc. 14-5, PageID.3315-16). That was the testimony Petitioner wanted to impeach with the recording. And that is quite different from saying that she was warned that she would go to jail if she told the truth that Petitioner did not do it. The trial court correctly noted that the victim's statements in the recording were not inconsistent with her trial testimony.

After Petitioner attempted to use the recording, and after the trial court made its ruling, the victim then later denied on cross-examination that she ever told her mother that she falsely accused Petitioner. (Doc. 14-6, PageID.3358-59.) But Petitioner did not after that point renew his motion to impeach this new testimony with the recording. Nor were the victim's statements obviously or substantially contradictory to her later testimony. The victim admitted that she was warned by her grandmother. In the recoding, the victim acknowledged the prior conversation with her mother

45

about a warning. And as the TCCA found after listening to the recording itself, the victim's "yes" response did not necessarily reflect her agreement that she previously told her mother "it didn't happen." Any ambiguity in the response was resolved when the victim then told her mother that she forgave Petitioner for what he had done, asked her mother whether she knew what Petitioner had done to her, and denied her mother's accusation that "they are making you say stuff."

Again, to show prejudice to excuse a procedural default, a habeas petitioner must show that the trial error worked to his actual and substantial disadvantage. Jamison, 291 F.3d at 388. Petitioner was not actually and substantially disadvantaged by exclusion of the recording. It lacked the defense value that he claims, and worse, the victim's other statements in the recording that she was not being made to say things and that she forgave Petitioner for what he did would have aided the prosecution's case against him. The claim, therefore, is procedurally barred from review and Petitioner fails to demonstrate that he was prejudiced by his inability to use the recording at trial.

11. Claims 12 and 13

In his twelfth claim, Petitioner asserts that Department of Children Service (DCS) documents show that the family lived in Wilson County at the time of the incidents, and therefore the victim lied about the allegations and the trial court did not have jurisdiction to try him. (Doc. 1, PageID.169-175).[5] In his thirteenth claim, Petitioner refers to his other substantive claims for relief, primarily the recording of the phone conversation, to show that there has been a fundamental

---

[5] To the extent Petitioner is asserting that the State suppressed the DCS records as a separate substantive claim for relief, the claim is unexhausted, and Petitioner's motion to amend the Petitioner has already been denied by this Court. (Doc No. 31). Furthermore, the Court notes that in denying Petitioner's petition for corum nobis, the Davidson County Criminal Court made a factual finding that Petitioner had possession of the referred-to DCS records at the time of his state trial. (Doc. 15-17, PageID.5316). Petitioner has not overcome that factual determination by clear and convincing evidence. See 28 U.S.C. § 2254(e).

46

miscarriage of justice and that he is innocent. (Doc. 1, PageID.176-195). The Court views these claims as an argument to overcome the procedural default of his other claims.

Where a habeas petitioner fails to demonstrate cause and prejudice to excuse a procedural default, a habeas court may nevertheless review the defaulted claims where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent." Dretke, 541 U.S. at 392. This alternative route to habeas review requires a habeas petitioner to show "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." McQuiggin, 569 U.S. at 399. He must show "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of non-harmless constitutional error." Id. at 401.

The Court has already discussed the recorded phone conversation and why it would not have benefited the defense, let alone proven Petitioner's innocence. This leaves the DCS records for consideration. The records consist of twelve DCS Case Recording Summaries. (Doc. 15-18, PageID.5362-74.) The summaries cover a period from June 28, 2011, to July 11, 2011. Essentially, they reveal that the victim's mother was taken into custody in May 2011, and she spent an unknown period of time in jail. On June 4, 2011, Petitioner dropped the children off at the grandmother's home in Nashville.[6] The records indicate that Petitioner and the victim's mother had recently been evicted from their residence in Wilson County. Thereafter a dispute arose. Petitioner wanted to take the children back from the grandmother and stay with them at a friend's house in Wilson County. The grandmother wanted to retain custody at the request of her daughter. Ultimately, Petitioner prevailed, and he was permitted to pick the children up from the grandmother's home

---

[6] The DCS records indicate that five children were involved. Petitioner had the three youngest children with the victim's mother, whereas the two oldest children, including the victim, were the product of a prior marriage. (Id. PageID.5364).

47

on June 29, 2011. During this period, both parties attempted to file for custody, and the records indicate that the DCS determined that Wilson County had jurisdiction over the custody dispute because it was the county of residence for the family. (Id.)

All the records demonstrate is that during some points between May and July of 2011, Petitioner and the victim resided in Wilson County. The period covered by the indictment, however, spanned from January 1, 2011, to March 18, 2012. (Doc. 14-1, PageID.2825). The victim was unable to testify as to specific dates for the incidents. She testified that the first incident occurred at her grandmother's house when she was "10 or 11 years old." (Doc. 14-5, PageID.3257)[7]. She testified that the second incident occurred at the Donelson home when the family briefly lived there. (Id. PageID.3270). The DCS records do not provide convincing evidence that the incidents could not have taken place because the family lived in Wilson County at the time of the incidents – the records only account for a brief window while the victim's mother was in jail. The records do not speak at all to where the family resided prior to May 2011, and period of the indictment begins in January 2011.

It may be that Petitioner is relying on statements in the records that indicate that Wilson County had jurisdiction over the custody dispute because that was the county in which the family resided, and therefore Donaldson County also did not have jurisdiction over his criminal case. That may be true as it pertains to a custody dispute arising in June 2011. But the statements in the records have no bearing at all on whether the Donaldson County Criminal Court had jurisdiction over a criminal case, which depended on the location of the crime and not the address of record for the family.

---

[7] The victim testified that she was born on June 5, 2000. (Doc. 14-5, PageID.3255). Thus, she was 10 or 11 years old for the entire period covered by the indictment.

Petitioner completely fails to demonstrate that it is more likely than not that no reasonable juror would have convicted him in the light of the information contained in the recorded phone conversation or the DCS records. McQuiggin, 569 U.S. at 399. He has therefore failed to show that a fundamental miscarriage of justice would result from imposition of a procedural default to his claims.

## V. PENDING MOTIONS

Petitioner filed a number of motions with the Court that remain pending. Petitioner moves for the Court to construe his pro se filings liberally. (Doc. 20). Petitioner seeks an order compelling Respondent to refile an unredacted copy of the state court record, to file a complete copy of the state court record that includes every document filed in every proceeding, and to file the audio and video recordings of all state proceedings. (Docs. 21, 22, and 28). Petitioner also requests a stay until such time as he is able to access a CD disk sent to him by Respondent that contains part of the state record. (Docs. 23, 30). Petitioner moves for the appointment of counsel. (Doc. 24). Petitioner seeks unrestricted access to the prison law library. (Doc. 25). Petitioner seeks to submit clearer versions of the DCS records. (Doc. 26). Petitioner moves to amend his petition to include unspecified civil rights claims. (Doc. 33). Finally, Petitioner moves for oral argument via video conferencing. (Doc. 41).

The Court has already determined that the petition is without merit, and none of the matters raised in the pending motions warrant a continuation of proceedings. With respect to the state record, Rule 7 (a) of the Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254, provides that the Court "may direct the record be expanded by the parties by the inclusion of additional materials relevant to the determination of the merits of the petition." The rules further require respondents

to attach the relevant portions of the transcripts of the state court proceedings, if available, and the court may also order, on its own motion, or upon the petitioner's request, that further portions of the transcripts or other evidence be furnished. See RULES GOVERNING § 2254 CASES, RULE 5, 28 U.S.C. foll. § 2254. The decision whether to expand a habeas record is within the discretion of the Court. See West v. Bell, 550 F.3d 542, 551 (6th Cir. 2008).

It is apparent from Petitioner's pleadings and from the Court's own review of the extensive state record, that every document necessary for a fair adjudication of Petitioner's claims has already been filed with the Court. Petitioner's complaint about the records being redacted to identify minors by their initials and his claimed inaccessibility to electronic copies sent to him by Respondent are not well taken. It is apparent from his lengthy pleadings that Petitioner has access to every state court filing and record relevant to his claims, and that he is well aware of the identity of the persons referred to by their initials. The Court has had no such difficulty following the redactions, and in any event, Petitioner filed an unredacted transcript trial testimony as an exhibit attached to his petition. (Doc. 1, PageID.711ff).

With respect to the request for Respondent to file the audio or video recordings of the state court proceedings, where there appears to be threshold legal bar to a habeas petition, the proper course is to deny motions seeking discovery. Williams v. Bagley, 380 F.3d 932, 974-76 (6th Cir. 2004)) (noting that discovery requests relating to procedurally defaulted claims were properly denied because discovery could not lead to a colorable basis for relief on those claims). A similar rationale applies here. Petitioner's allegations fail to persuade the Court that his claims will find substantial support in audio or video recordings of the proceedings. Petitioner presents nothing to the Court other than his bare claim that statements were made on the record that don't appear in the transcripts.

Furthermore, it is apparent from his multiple and lengthy pleadings that Petitioner has been granted adequate access to the prison law library to allow him to effectively prosecute this case. The Court will also exercise its discretion to deny the appointment of counsel, Childs v. Pellegrin, 822 F.2d 1382, 1384 (6th Cir. 1987), and it will deny his request for oral argument. See M. DIST. TENN. LR 78.01.

Finally, the Court notes that Respondent filed its answer on August 5, 2024. Since that date Petitioner has filed numerous motions and other pleadings, but he has not filed a reply brief. Because Petitioner has had more than ample opportunity to reply to Respondent's answer, and because Petitioner has fully presented his legal position in his 184-page petition, the Court "sees no reason to waste further judicial resources on this case" and therefore issues this dispositive opinion without a reply brief having been filed. See Lovelace v. Attorney General of Illinois, 741 F. Supp. 1318, 1319 (N.D. Ill. 1990).

## VI. CONCLUSION

For the reasons set forth herein, the petition seeking relief under 28 U.S.C. § 2254 will be denied, and this action will be dismissed with prejudice.

In so ruling, the Court notes that it does not write on a clear slate in adjudicating the petition. The Court does not resolve the petition by deciding, for example, whether Petitioner was in fact guilty (and if so, of what), or whether Petitioner should have been convicted by the jury (and if so, of what). Instead, the Court applies established principles to determine the extent to which it can review Petitioner's claims at all, and, for those claims that it determines it can review, it applies the demanding standards of AEDPA.

51

## VII. CERTIFICATE OF APPEALABILITY

Federal Rule of Appellate Procedure 22 provides that an appeal of the denial of a habeas petition may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing § 2254 Cases requires that a district court issue or deny a COA when it enters a final order. A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 327 (2003). The district court must either issue a COA indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); FED. R. APP. P. 22(b).

Because jurists of reason would not disagree with the resolution of Petitioner's claims, the Court will deny a COA. Petitioner may seek a COA from the Sixth Circuit.

An appropriate order will be entered.

_____

WAVERLY D. CRENSHAW, JR.

UNITED STATES DISTRICT JUDGE

52